UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------
In re

ERIC S. & JULIA J. VINING,                         Case No. 06-12593
                              Debtor(s).
-----------------------------------------------------------
APPEARANCES:

O'CONNELL & ARONOWITZ                              Richard H. Weiskopf, Esq.
*Attorneys for the Debtors*
54 State Street
9th Floor
Albany, New York 12207

DEILY, MOONEY & GLASTETTER. LLP
*Attorneys for Creditor*
8 Thurlow Terrace
Albany, New York 12203

ANDREA E. CELLI, ESQ.
*Chapter 13 Standing Trustee*
350 Northern Blvd.
Albany, NY 12204

Hon. Robert E. Littlefield, Jr., U.S. Bankruptcy Judge

## MEMORANDUM-DECISION AND ORDER

Currently before the court are the objections to confirmation of the chapter 13 plan of

Eric S. and Julia J. Vining ("Debtors") by Andrea E. Celli, Chapter 13 Trustee ("Trustee"), and

eCast Settlement Corporation, assignee of Bank of America/FIA Card Services, formerly MBNA

("eCast"or "Creditor").  The court has jurisdiction over this core matter pursuant to 28 U.S.C. §§

157(a), (b)(1), (b)(2)(L), and 1334.[1]  Based on the within reasoning, the court denies

---

[1] The remaining statutory references are to the Bankruptcy Code 11 U.S.C. §§ 101 to 1532, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, unless otherwise noted.

1

confirmation.

## FACTS

The facts are not in dispute.[2] On October 5, 2006, the Debtors filed a chapter 13 petition, proposed plan, schedules, and Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income (Form B22C)[3], known as the means test. (Nos. 1 and 2.) Accordingly, this case is governed by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which became effective on October 17, 2005. Debtors scheduled unsecured debt of approximately $76,209. eCast is the holder of an unsecured claim against the Debtors arising out of the Debtors use of a certain credit card account. eCast represents approximately 37% of the Debtors' scheduled unsecured non-priority debt.

The Debtors filed an amended Form B22C on March 5, 2006 (No. 22), along with amended schedules I and J (No. 21), to correct certain entries and modify others based upon debtor Julia A. Vining's post-petition change in employment. The Debtors also filed an amended plan on March 5, 2007, increasing the term of their plan from 36 months to 60 months. (No. 23.) A second amended plan was filed on March 29, 2007, which eliminated the separate classification of the Debtors' student loan obligation and instead provided for direct payment by the Debtors.[4] A second amended schedule J was filed on May 4, 2007, adding the student loan payment as a monthly budgeted item. (No. 29.) The Debtors' third amended schedule J filed on

---

[2] The court assumes familiarity with the Stipulation of Facts filed June 19, 2007 (No. 40) and the Supplemental Stipulation of Facts filed November 1, 2007 (No. 47).

[3] Form B22C was introduced as an interim form with the enactment of BAPCPA. Interim Form B22C became Official Form 22C when the official forms were adopted.

[4] In their original chapter 13 plan, the Debtors proposed separately classifying their student loan debt and paying it in full through the plan. (No. 2.)

May 30, 2007, deleted from the Debtors' monthly expenses the direct payment of the student loan debt, as well as a $287 car payment to Bank of the West. (No. 34.)

The Debtors filed a second amended Form B22C on May 22, 2007. (No. 31.) The second amended Form B22C shows the Debtors as having above median family income[5] and disposable monthly income of $182.16. As above-median income debtors, the second amended Form B22C, indicates the Debtors' applicable commitment period ("ACP") is five years. (No. 31, line 17.) On May 31, 2007, the Debtors filed a third amended plan. (No. 35.) The third amended plan provides for a payment of $778.73 per month for 53 months.[6] Pursuant to the terms of the proposed third amended plan, the Debtors' attorney's fees will be paid first, followed by a distribution to Bank of the West and HSBC Auto Finance, the creditors holding claims secured by the Debtors' vehicles[7] and, as in every case, the Trustee will be paid her statutory commissions. The third amended plan provides unsecured creditors, including the Debtors' student loan obligation, will be paid subsequent to these classes and receive a net dividend of $16,062.34, to be shared pro-rata.[8] This will result in a percentage payback of at

---

[5] Federal Rule of Bankruptcy Procedure 1007(b)(6) requires that all chapter 13 debtors complete Parts I and II of Official Form 22C (formerly Interim Form B22C) to calculate a debtor's current monthly income and to determine whether a debtor's annualized current monthly income is above or below the median family income of similarly-sized households for the applicable state.

[6] The court assumes the Debtors will consummate their five year ACP, and notes no specific objection has been raised to the length of the Debtors' third amend plan.

[7] eCast's objection to confirmation included an objection to the Debtors' direct payment of their car loan to Bank of the West. This portion of eCast's objection was rendered moot by the Debtors' third amended plan.

[8] eCast's objection to confirmation also included an objection to the Debtors' direct payment of their student loan obligation. This portion of eCast's objection was also rendered moot by the Debtors' third amended plan.

least 19.58% for timely filed unsecured claims.

eCast filed its objection to the Debtors' plan on December 7, 2006, and the Trustee filed her objection to confirmation on January 10, 2007. Subsequently, eCast filed a supplemental objection on March 21, 2007, and an objection to the confirmation of the second amended plan on April 18, 2007. The court heard oral argument on May 3, 2007, and issued a briefing schedule. The final submission was filed on November 1, 2007, at which time this matter was considered fully submitted.

## ARGUMENTS

The Creditor's principle objection to confirmation, in light of the Debtors' filing a third amended plan, is that the Debtors fail to provide for the submission of all their projected disposable income pursuant to § 1325(b)(1)(B). The Creditor notes that "projected disposable income" is not defined in the Bankruptcy Code, but that "disposable income" is defined in § 1325(b)(2) as "current monthly income," less amounts reasonably necessary for a debtor's support, a debtor's dependent's support, a debtor's domestic support obligation, qualifying charitable contributions up to a specified limit, and/or the continued viability of a debtor's business. The Creditor also points out that "current monthly income" ("CMI") is defined in § 101(10A) as the average monthly income that the debtor received during the six month period prior to filing a petition less certain benefits, not applicable in this case. The Creditor argues that although CMI requires a historical six month average, for purposes of confirming a plan, the court should consider the Debtors' anticipated income. The Creditor relies on *In re Hardacre*, 338 B.R. 718 (Bankr. N.D.Texas 2006), and its progeny to support its position. The Creditor asserts that *Hardacre* stands for the proposition that disposable income, as defined in §

4

1325(b)(2), is only a starting point, and a debtor's actual current financial picture, as reflected on a debtor's schedules I and J is, in effect, the end point. The Creditor argues that in the case *sub judice* the Debtors should be paying into their plan the net monthly income reflected on their third amended schedule J, namely $1,804.01, and not the $778.73 that is based, at least partially, on their second amended Form B22C.

In addition to the arguments raised by the Creditor, the Trustee opines that the Debtors' third amended plan runs afoul of the "good faith" requirement of § 1325(a)(3).[9] The Trustee cites to *In re LaSota,* 351 B.R. 56 (Bankr. W.D.N.Y. 2006), to support the theory that "the debtors' accumulation of wealth is not the purpose of Chapter 13, and that debtors' actual 'projected disposable income' *standing alone* requires a 100% plan . . . ." (Trustee's Mem. of Law 23 (emphasis in original) (No. 41).) The Trustee states that application of the good faith test based upon the "totality of the circumstances" as articulated by Judge Gerling in *In re Corino,* 191 B.R. 283 (Bankr. N.D.N.Y. 1995), dictates that confirmation be denied.

The Debtors rely upon *In re Guzman*, 345 B.R. 640 (Bankr. E.D. Wis. 2006), *In re Alexander*, 344 B.R. 742 (Bankr. E.D.N.C. 2006), and *In re Barr*, 341 B.R. 181 (Bankr. M.D.N.C. 2006), for the proposition that "disposable income" is a historic number based on a debtor's CMI as defined in § 101(10A). Accordingly, the Debtors assert that projected disposable income is a number derived from the past and simply projected into the future. Additionally, the Debtors state that the passage of BAPCPA was intended to diminish judicial discretion and that strict construction of the new law would dictate confirmation of the plan.

---

[9] Section 1325(a) states, in relevant part, "[t]he court shall confirm a plan if . . . (3) the plan has been proposed in good faith and not by any means forbidden by law . . . ." 11 U.S.C. § 1325(a)(3).

Finally, the Debtors argue that in proposing to pay funds in excess of that required by Form B22C, the plan has been proposed in good faith.

## DISCUSSION

Subsequent to the parties filing their respective briefs, the court rendered *In re Green*, 378 B.R. 30 (Bankr. N.D.N.Y. 2007), which agreed, for the most part, with the *Alexander, supra,* analysis. Specifically, *Green* held, in relation to the issue in the current case, that disposable income and projected disposable income are interrelated and are based on historical numbers as mandated in § 1325(b). *Id.* Applying the court's analysis in *Green* to the case *sub judice* leads to the conclusion that the Debtors' current financial picture is not relevant for confirmation purposes. *Id.* A debtor's current financial information contained on schedules I and J simply does not mesh with the backward glance required by § 1325(b)(1)(B) at confirmation. Thus, the apparent ability of the Debtors to contribute additional non-CMI funds to the proposed plan payment is not an impediment to confirmation for the projected disposable income requirement of § 1325(b)(1)(B).[10] Section 1325(b)(1)(B), however, is about more than simply how much the Debtors have to pay to the Trustee; it is also about when they must pay it, and to whom it must be disbursed by the Trustee.

As amended by BAPCPA, § 1325 provides, in part:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan -

---

[10] Precedent exists for the proposition that § 1325(b) does not apply to a § 1329 modification which would mean instead of utilizing a debtor's historical finances, the court would instead look to the accuracy of a debtor's current financial picture. As the current case involves a § 1325(a) and (b) confirmation issue, the court need not weigh in on this debate at this time.

> . . . .
>
> (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan *will be applied to make payments to unsecured creditors under the plan*.

11 U.S.C. § 1325(b)(1)(B) (emphasis added). The statute unequivocally requires the Debtors' projected disposable income to be disbursed to the unsecured creditors. In effect, this section sets up a trust fund for unsecured creditors within the Trustee's disbursement account. This process begins on the date "that the first payment is due under the plan."[11] The one variable not addressed by § 1325(b)(1)(B) is when the Trustee must disburse the unsecured creditor funds. Section 1326(a)(2) states, in relevant part, "[i]f a plan is confirmed, the trustee shall distribute . . . as soon as is practicable."[12] Thus, the initial distribution to unsecured creditors from the projected disposable income cache would be a lump sum upon confirmation followed by regular disbursements over the duration of the ACP. This unsecured fund is sacrosanct; additional monies would be needed from alternative sources to remit to other classes of creditors. As pointed out in *Green*:

> [i]n many instances, the § 1325(b)(1)(B) projected disposable income payment will only

---

[11] Section 1326(a)(1) states, in relevant part, "[u]nless the court orders otherwise, the debtor shall commence making payments not later than 30 days after the date of the filing of the plan or the order for relief, whichever is earlier, in the amount - (A) proposed by the plan to the trustee . . . ." It is difficult to imagine a scenario where a plan would be filed before the order for relief is granted. Thus, it would appear that, absent extraordinary circumstances, the first payment to the trustee will be due 30 days after the filing of the petition.

[12] This language was added due to the Congressional perception that some trustees were "unduly delaying distributions." 8 L. King, COLLIER ON BANKRUPTCY ¶ 1326.02 [2] p. 523-92.2 (15th ed. rev. 1998).

7

> be a portion of a debtor's total plan payment. If all the debtor's projected disposable income is to be tendered to the unsecured creditors, none of these funds will reach other creditor classes (e.g. secured, administrative, etc.). A debtor must use other funds that have survived the Form B22C scrutiny to complete the payment to be received and disbursed by the Chapter 13 Trustee.

*In re Green*, 378 B.R. at 33-34.

This result gives credence to the Congressional amendment in § 1325(b)(1)(B) which added "to unsecured creditors." Pre-BAPCPA, any money stream from disposable income would have simply been applied to payments under the plan. Thus, under the law in effect prior to October 17, 2005, a proposal to leave funding of unsecured claims to the end of the plan, as in the plan *sub judice*, would not have been *ipso facto* improper. Presumably, in effectuating the 2005 amendments, Congress wanted heightened protection for the unsecured creditor body. This is accomplished by requiring immediate, in effect, protected status of the Debtors' disposable income that is tendered to the Trustee every month for unsecured creditors. Otherwise, in many cases, a debtor would have little incentive to remain in a Chapter 13 plan once the secured creditors' claims or issues were resolved. By vesting the funds in the unsecured creditors immediately and requiring concurrent payment of secured and unsecured claims,[13] Congressional intent is achieved, and there is maximum incentive for a debtor to remain in a chapter 13 plan. This precept is violated by the Debtors' third amended plan currently before the court. While it is true that under their third amended plan, the Debtors are proposing to pay unsecured creditors more than the formula amount set forth in § 1325(b)(1)(B), there is no guarantee unsecured creditors will ever see those funds based upon the Debtors'

---

[13] Under the Bankruptcy Code, a plan may "provide for payments on any unsecured claim to be made concurrently with payments on any secured claim or any other unsecured claim . . . ." 11 U.S.C. § 1322(b)(4).

8

proposed distribution scheme.  The case could be dismissed or converted before any monies reach the protected class.

Under the new à la carte BAPCPA menu, a debtor's plan recipe must begin with projected disposable income, in this case $182.16.  Other amounts may then be added to the base ingredients to ensure that appropriate amounts are available to pay to other creditor classes as needed or required.  The unsecured creditor's offering must then be remitted with the first confirmed plan distribution from the Trustee.  Clearly, in the instant case, unsecured creditors will not be treated in that manner.  The Debtors' third amended plan requires that creditors be paid in the following chronological sequence: Debtors' attorney, secured creditors and finally unsecured creditors.  According to the third amended plan, the first two classes will be satisfied in approximately 27 months.  Thus, unsecured creditors would not begin to receive any funds for well over two years, instead of from the first distribution.  Secured creditors are entitled to be paid on their depreciating collateral, however, unsecured creditors are equally entitled to their share of the pie, i.e. the Debtors' projected disposable income.

For better or worse, the Trustee and the Creditor have triggered the chain reaction of §1325(b)[14] that now results in denial of confirmation.  Under the tainted plan before the court, although unsecured creditors would theoretically receive at least $16,062.34, the distribution timing sequence does not comport with § 1325(b)(1)(B).  Whether any fourth amended plan garners another § 1325(b) objection is left to the discretion of the Trustee and unsecured creditors.

---

[14] Even though no specific complaint to the timing of payments and disbursement was received, after an objection is filed by the Trustee or the holder of an allowed unsecured claim, the court must ensure that the totality of § 1325(b) is complied with.  *See* 11 U.S.C. 1325(b).

CONCLUSION

Based upon the foregoing, confirmation of the Debtors' third amended plan is denied.[15]

The Debtors shall have 30 days to renotice confirmation.

It is so ORDERED.

Dated:   Albany, New York                    /s/ Robert E. Littlefield, Jr.
         May 14, 2008                        _____
                                             Hon. Robert E. Littlefield, Jr.
                                             U.S. Bankruptcy Judge

---

[15] Because the Debtors' Third Amended Plan is uncomfirmable under the mandates of §1325(b), the court need not address the Trustee's good faith objections pursuant to § 1325(a)(3).